IN THE TENNESSEE COURT OF CRIMINAL APPEALS
AT JACKSON
DECEMBER 1998 SESSION

FILED

**March 15, 1999**

**Cecil Crowson, Jr.**
**Appellate Court Clerk**

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | C.C.A. NO. 02C01-9711-CC-00449 |
| | ) | |
| V. | ) | SHELBY COUNTY |
| | ) | |
| TYRONE CHALMERS, | ) | HON. CAROLYN WADE BLACKETT |
| | ) | |
| Appellant. | ) | (Especially Aggravated Robbery and |
| | ) | Felony Murder - Death Penalty) |
| | ) | |

For the Appellant:

Linda Kendall Garner
William L. Johnson
50 North Front Street, Suite 780
Memphis, TN 38103

For the Appellee:

John Knox Walkup
Attorney General and Reporter

Amy L. Tarkington
Assistant District Attorney General
450 James Robertson Pkwy.
Nashville, TN 37243-0493

District Attorney General
John W. Pierotti

James J. Challen, III
Assistant District Attorney General
Criminal Justice Center - Third Floor
201 Poplar Avenue
Memphis, TN 38103

OPINION FILED:_____

AFFIRMED

GARY R. WADE, PRESIDING JUDGE

## OPINION

The defendant, Tyrone Chalmers, was convicted of especially aggravated robbery and felony murder. The jury imposed the death penalty on the basis that the defendant had been previously convicted of one or more felonies whose statutory elements involved the use of violence to the person. Tenn. Code Ann. § 39-13-204(i)(2). The trial court imposed a concurrent twenty-year sentence for the robbery conviction. In this appeal of right, the defendant has presented for our review the following issues:

> (I) whether the evidence is sufficient to support the first degree murder conviction;
>
> (II) whether the trial court erred by admitting an unduly prejudicial crime scene photograph;
>
> (III) whether the trial court erred by admitting the defendant's pretrial statement; and
>
> (IV) whether the death penalty is proportionate punishment under the circumstances of the case.

The judgment of the trial court is affirmed.

The twenty-eight-year-old victim, Randy Allen, resided with his grandmother, Stella L. Hayes. At 5:00 a.m. on August 20, 1994, Harvey L. Smith, the victim's cousin, and five or six others in the neighborhood found the victim lying face down next to a city street. The pants of the victim had been pulled down around his ankles.

Officer Daryl Taylor of the Memphis Police Department arrived at the scene a short time later. The body, which had gunshot wounds, had not been moved. Officer Taylor called for an ambulance but paramedics pronounced the victim dead. As soon as the police arrived, Ms. Hayes was called to the scene and

2

identified the body of her grandson. Marlon Murphy, the victim's cousin, was also a victim in this incident.[1]

Officer R.G. Moore, also with the Memphis Police Department, arrived after Officer Taylor. He collected four shell casings found near the victim's body. A weapon was never recovered.

Ten days after the shooting, Sgt. Dewayne Woods and Sgt. James L Nichols questioned the defendant about his involvement in this crime. Sgt. Woods, who had taken an earlier statement from the defendant concerning an unrelated robbery, advised the defendant of his rights. During the course of the investigation, the defendant admitted that he shot and killed the victim while attempting a robbery:

> I met up with "Dre" and "Black" on Orleans and So. Parkway near the park. "Black" was driving something like a [sic] Oldsmobile, "Dre" was in the front passenger seat and I got in the back seat. We were just riding around looking for somebody to rob. I had some kind of automatic rifle, it had a clip in it, black and brown color. "Dre" had a .380 automatic or something, look [sic] black to me. I think "Black" had a shotgun. "Black" was driving down Netherwood, and me and "Dre" jumped out on two boys. We tried to rob them. We made them strip, then I had hit the one that was killed with the rifle and it went off, and I couldn't let the rifle go. Then me and "Dre" jumped in the car and left, with "Black" driving. Then "Black" dropped me and "Dre" off near a house, close to Southside School.

The defendant, who robbed Murphy and the victim of $3.00, told the officers that the gun "kept shooting, 'bout six (6) times." The defendant stated that he was "sorry it ever happened. If I could go through it again, I wouldn't."

Dr. Jerry Thomas Francisco, County Medical Examiner for Shelby

---

[1]The charges against the defendant for the assault upon Murphy, who survived the incident, were dropped due to Murphy's unavailability as a witness for the prosecution.

County, performed the autopsy on the victim. The victim died as a result of five gunshot wounds. One entered the back of the head, one entered the back just above the hipbone, one struck the left forearm, one entered the back of the left leg, and one passed through the victim's thigh. All five bullets passed through the body of the victim. Dr. Francisco testified that either the wound to the head or the back could have caused death. The blood and urine screens on the victim's body revealed traces of alcohol and cocaine.

At the sentencing phase of the trial, Juline Young, Deputy Clerk for the Shelby County Criminal Court Clerk's Office, testified that the defendant had been previously convicted of attempted especially aggravated robbery and attempted first degree murder for a criminal episode occurring on the same date as this murder. Joseph William Hunter, the victim of those prior crimes, testified that as he was driving his vehicle at approximately 3:00 a.m., the defendant stopped in front of his car, pointed a rifle at him, and directed him to "give it up G." Hunter testified that he accelerated past the defendant, who then fired fifteen rounds at his car. Hunter was struck by two of the bullets; one broke his leg and the other struck his arm.

The defendant's mother, Clytee Beatrice Chalmers, testified that the defendant was a good child and had never given her any problems. She related that the defendant had graduated from high school and was employed at the time of this crime. She testified that she suffered from diabetes and that the defendant took care of her when she had complications with her disease.

At the time of trial, the defendant had five brothers and one older sister. Clytis Chalmers, the defendant's sister, testified that she had visited the defendant every week during his incarceration. She described the defendant as her

4

best friend, a "very caring person."  The defendant's sister testified that the defendant had been in juvenile court only once when he was younger.

The defendant, twenty-one years old at the time of these offenses, testified at the sentencing phase of the trial that he smoked crack cocaine for the first time and had consumed alcohol only hours before he committed these offenses.  He claimed that he blacked out and could not remember all of the events from that night but did recall that the gun he used belonged to one of his accomplices.  The defendant testified that he was unfamiliar with the operation of the weapon.  While conceding that he had been in juvenile court on a prior occasion, he testified that he had not committed any offenses since reaching adulthood, other than those on the night of the murder.  The defendant apologized for his actions.

I

Initially, the defendant argues that the evidence was insufficient to support his conviction for felony murder.  He contends the state's case is based solely on his "questionable" statement and that his guilt has not been established beyond a reasonable doubt.  We cannot agree.

A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the state and resolves all conflicts in favor of the state's theory. State v. Hatchett, 560 S.W.2d 627, 630 (Tenn. 1978); State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973).  On appeal, "the state is entitled to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom." State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  This court does not reweigh or reevaluate the evidence. Id.  The

5

jury's verdict, therefore, will only be disturbed if, after a consideration of the evidence in the light most favorable to the state, a rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307 (1979); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983); Tenn. R. App. P. 13(e).

At the time of this offense, felony murder was defined as the "reckless killing of another committed in the perpetration of, or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (1991).[2] "'Reckless' refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." Tenn. Code Ann. § 39-11-106(31). Especially aggravated robbery is "the intentional or knowing theft of property from the person of another by violence or putting the person in fear" accomplished with a deadly weapon and where the victim suffers serious bodily injury. Tenn. Code Ann. §§ 39-13-401(a), -403(a) (1991).

In our view, the defendant's confession established all of the elements of the offense. The defendant acknowledged that he robbed the victim and that his gun went off, fatally injuring the victim. A defendant, however, cannot be convicted solely upon the evidence of his inculpatory statement. See Ashby v. State, 139 S.W. 872, 875 (Tenn. 1911). Under our law, the "corpus delicti [of the crime] cannot be established by a confession alone." Taylor v. State, 479 S.W.2d 659, 662 (Tenn. Crim. App. 1972). A confession may sustain a conviction when "there is other

---

[2]In 1995, about one year after this offense, the "reckless" requirement was deleted from the felony murder statute. See Tenn. Code Ann. § 39-13-202(a)(2) (1995 Supp.).

6

evidence to show the commission of the crime by someone." <u>State v. Stapleton</u>, 638 S.W.2d 850, 854 (Tenn. Crim. App. 1982). The slightest corroborating evidence of the confession to the crime is sufficient, however. <u>See</u> <u>State v. Ervin</u>, 731 S.W.2d 70, 72 (Tenn. Crim. App. 1986). Furthermore, while a confession may be corroborated by independent proof, the corroborating evidence need not connect the defendant with the crime. <u>Buckingham v. State</u>, 540 S.W.2d 660, 663 (Tenn. Crim. App. 1976). Similarly, the corroborating evidence necessary to support the corpus delicti need not be sufficient, in and of itself to support the conviction, but need only provide "the essential facts . . . to justify a jury inference of their truth." <u>Opper v. United States</u>, 348 U.S. 84, 93 (1954).

Here, the defendant acknowledged that he and his accomplices had driven around the city on the night in question looking for someone to rob. There was no other direct evidence to support the defendant's confession that he robbed and killed the victim. Yet the evidence introduced at trial was adequate for a rational jury to find beyond a reasonable doubt that the defendant committed murder during the perpetration of armed robbery. The defendant told others the location of the body. The victim was found at that location lying face down on the ground. The pants of the victim had been pulled down to his ankles. That would have prevented the victim from escaping on foot. Finally, the coroner confirmed that the victim had been shot in the back five times.

Because the corroborative evidence need not be sufficient in and of itself to support the conviction and need only justify a jury inference of the truth of the corpus delicti, the evidence here is more than enough to corroborate the defendant's confession that he committed the murder. These same facts would also permit an inference that the victim was being robbed at the time of his death. The

7

pants at the ankles would indicate that the robbers not only intended to restrict the movement of the victim but also had access to the clothing article most likely to contain the money of the victim.

## II

Next, the defendant contends that the trial court erroneously admitted a photograph of the victim as he was found on the street. The photo depicts the victim lying face down. His pants had been lowered to ankle level. The defendant insists that "the photo in question was void of probative weight and packed full of impermissible and inflammatory content."

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Rule 403, Tenn. R. Evid., however, provides that relevant evidence may be excluded in certain situations:

> Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Simply because evidence is prejudicial does not mean the evidence must be excluded as a matter of law. See State v. Gentry, 881 S.W.2d 1, 6 (Tenn. Crim. App. 1993). Courts must still determine the relevance of the photograph and weigh its probative value against any undue prejudice.

In State v. Banks, 564 S.W.2d 947, 951 (Tenn. 1978), our supreme court recognized "the inherently prejudicial character of photographic depictions of a

8

murder victim...."  In adopting Federal Rule of Evidence 403 as its test for admissibility, the court suggested a variety of factors for consideration by the trial judge.  The "value of photographs as evidence, ... their accuracy and clarity ... whether they were taken before the corpse was moved ... [and] the inadequacy of the testimonial evidence in relating the facts to the jury" are appropriate factors.  Id.

The admissibility of relevant photographs of the victim is within the sound discretion of the trial judge, and his or her ruling on admissibility will not be disturbed on appeal absent a clear showing of an abuse of that discretion.  Banks, 564 S.W.2d at 949.  See also State v. Bigbee, 885 S.W.2d 797, 807 (Tenn. 1994); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993).

The photograph at issue is clearly relevant.  The state had to prove, notwithstanding the defendant's confession, that the defendant killed the victim during an attempt to commit an especially aggravated robbery.  The photograph suggests that the victim was shot in the back causing him to fall face down.  As the state argued at trial, the victim's pants could have been dropped to his ankles to prevent him from fleeing or otherwise resisting during the robbery.  Although a portion of the body is nude, neither the wounds nor blood are highlighted in the photo at issue.  The photograph is particularly relevant as corroborative of the details of the incriminating statement made by the defendant.  In our assessment, the probative value outweighs any undue prejudicial effect.

As a collateral claim, the defendant also contends that the admission of the photograph into evidence violated his right to due process and his right to be free from cruel and unusual punishment.  See U.S. Const. amend. VIII, XIV.  We do not agree.  The photograph is not so inflammatory as to cause the jury to convict out

9

of passion or caprice. The facts, in this context, do not form any basis for a claim of cruel or unusual punishment.

III

The defendant also claims the statement he gave to the police was the result of coercion and force and should not have been admitted at trial. We disagree.

At the hearing on the motion to suppress, Lt. James L. Nichols of the Memphis Police Department testified that he assisted Sergeant D. E. Woods in the August 20, 1994, interrogation of the defendant. Lt. Nichols recalled that the defendant was informed of his Miranda rights before any questions were submitted. According to Lt. Nichols, the defendant understood his rights and wished to make a statement to the police. Lt. Nichols stated that neither he nor Sergeant Woods coerced or threatened the defendant in any way and never promised him anything in exchange for his statement. He described the statement as freely and voluntarily given. The statement, which was made during a forty-five minute interview, was reduced to writing and signed by the defendant. Lt. Nichols, who described the defendant as reasonably intelligent, did not remember whether the defendant signed a separate "advice of rights" document.

Elise Flowers, who transcribed the statement as Lt. Nichols and Sgt. Woods conducted the interview, testified that the defendant was advised of his rights before the interrogation. She testified that the defendant acknowledged his rights, agreed to talk, and was not threatened, coerced, or promised anything in return for his answers. Ms. Flowers did not remember whether the defendant had singed a separate "advice of rights" form or whether he had read the transcript of

10

the interview in her presence.

At the suppression hearing, the defendant claimed that he had been questioned previously by the officers and had informed them that he did not want to give a statement. He asserted that he had not been advised of his rights and did not understand why he was being forced to give a statement. The defendant testified that Sgt. Woods and two other officers struck him on the head several times with a telephone book. The defendant alleged that the officers forced the confession and written transcript. He insists that Ms. Flowers gave false testimony.

On cross-examination, the defendant admitted that he was in custody at that time on an attempted robbery and attempted murder charge stemming from the separate incident which had occurred earlier on the same night as the murder. The defendant, who had pled guilty to those charges prior to this hearing, stated that he gave a statement relating to the earlier incident at about the same time he gave the statement in this case. The defendant testified that he was beaten and forced to talk during both interviews. He conceded, however, that he failed to bring these claims to the attention of the trial judge who accepted the guilty pleas to attempted murder and attempted especially aggravated robbery. When asked during the submission hearing, the defendant asserted that he had voluntarily given the statement without being coerced or threatened. He explained this omission on his being "stressed out" because his mother was having health problems. Interestingly, the defendant acknowledged that he had been advised of his rights before he gave a statement on the prior charges and that he understood and voluntarily waived those rights.

Sgt. Woods denied having physically or verbally abused the defendant

11

at any time before or during the interview on the felony murder. Sgt. Woods testified that he advised the defendant of his rights, did not coerce the defendant, and did not suggest what answers the defendant should provide.

To support his argument that the trial court erred in denying his motion, the defendant places primary emphasis on his testimony that he was beaten with a telephone book and that the initial "advice of rights" document has been lost or misplaced.

It is the duty of the trial judge to determine the voluntariness and the admissibility of the defendant's pretrial statement. State v. Pursley, 550 S.W.2d 949, 952 (Tenn. 1977). The trial court's determination that a confession was given knowingly and voluntarily is binding on the appellate courts unless the evidence preponderates otherwise. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. In addition, "the party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." Id. The trial judge did not make explicit findings of fact in this case, simply stating, "At this time, based on the testimony and based on the Court's review of the statements and other evidence, the Motion to Suppress by the defendant will be denied at this time." Nevertheless, the denial of the motion implies a determination that the defendant did voluntarily and knowingly waive his rights. See State v. House, 592 S.W.2d 902, 904 (Tenn. Crim. App. 1979).

In Miranda v. Arizona, 384 U.S. 436, 479 (1966), the United States

12

Supreme Court ruled that before a custodial interrogation, police officers must advise defendants of the right to remain silent and the right to counsel. If these warnings are not given, any statement elicited from a defendant is not admissible in trial. Stansbury v. California, 511 U.S. 318, 322 (1994). A defendant's rights to counsel and against self-incrimination may be waived as long as the waiver is made "voluntarily, knowingly, and intelligently." State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn. 1992). The Fifth Amendment right against self-incrimination may be waived only if done so voluntarily, knowingly, and intelligently. Miranda, 384 U.S. at 479. In order for an accused to effect a waiver, he must be adequately apprised of his right to remain silent and the consequence of deciding to abandon it. State v. Stephenson, 878 S.W.2d 530, 544 (Tenn. 1994). In determining whether the confession was voluntary and knowing, the totality of the circumstances must be examined. State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997).

In our view, the trial court properly denied the motion. Implicit in the conclusion reached by the trial court is that the testimony of the three witnesses for the state was more credible than that of the defendant. While there is no separate "advice of rights" form, both the written statement and the testimony at the suppression hearing specifically demonstrate that the defendant was advised of and waived his rights before talking to police. "The law does not require a written waiver," as long as the record demonstrates the defendant was advised of his rights and did, in fact, waive them. State v. Mann, 959 S.W.2d 503, 530 (Tenn. 1997). See also State v. Elrod, 721 S.W.2d 820, 823 (Tenn. Crim. App. 1986) (absence of written waiver does not per se require suppression if waiver can be found from the surrounding circumstances). The evidence simply does not preponderate against the trial court's ruling. See Odom, 928 S.W.2d at 23. Thus, the issue is without merit.

13

IV

Pursuant to Tenn. Code Ann. § 39-13-206(c), this court must review the sufficiency of the aggravating evidence against the mitigating evidence offered, determine whether the sentence of death was imposed in an arbitrary fashion, and assess whether the sentence is excessive or disproportionate to the penalty imposed in similar cases. We should point out that the defendant failed to address these issues in his original appellate brief. During oral argument, this court granted counsel additional time to file a supplemental brief. In State v. Bland, 958 S.W.2d 651, 667 (Tenn. 1997), our supreme court held that both parties on appeal must fully brief the proportionality issue.

The testimony at trial established that several hours before he committed the robbery and murder of Randy Allen, the defendant attempted to commit an armed robbery of Joseph William Hunter. As Hunter attempted to escape in his vehicle, the defendant opened fire. Several shots struck the vehicle and the victim was struck by the bullets. Before the trial in this case, the defendant pled guilty to attempted especially aggravated robbery and attempted murder. These qualified as prior violent felonies and constituted the sole basis for the application of the single aggravating circumstance applicable to the defendant. At trial, the defendant did not contest the evidence of the prior criminal conduct. Thus, the evidence introduced at the sentencing phase was clearly sufficient to support the statutory aggravating circumstance relied upon by the state.

During the sentencing phase of the trial, the defendant, his mother, and his sister testified for leniency. His mother testified that the defendant made decent grades in school and never gave her any problems as a child. She was unaware the defendant had been arrested as a juvenile. The sister testified that the

14

defendant was a caring person, but that he had some trouble with the law as a juvenile. The defendant expressed his remorse for his actions in this case and implied that his conduct on that evening was the result of drug and alcohol abuse. While the defendant testified that he did not remember many of the events due to a black out, his statement to the police is significantly more detailed; there is no mention of drug or alcohol use.

The statute requires only one aggravating circumstance. Upon review of the entire record, this court must conclude the jury's determination that this sole aggravating circumstance outweighs the minimal mitigating evidence offered by the defendant is supported by the evidence.

We should point out that no expert testimony was introduced at the penalty phase of the trial. The evidence of mitigating circumstances that the defense did offer was minimal. In Goad v. State, our supreme court emphasized the importance of the preparations for the sentencing phase of a trial:

> The Eighth and Fourteenth Amendments to the United States Constitution mandate that a death sentence be based on a "particularized consideration of relevant aspects of the character and record of each ... defendant." In this respect, "evidence about the defendant's background and character is relevant because of the belief ... that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems may be less culpable than defendants who have no such excuse." Thus, although there is no requirement that defense counsel present mitigating evidence in the penalty phase of a capital trial, counsel's duty to investigate and prepare for a capital trial encompasses both the guilt and sentencing phases. [There is a] "greater duty of inquiry into a client's mental health imposed for the penalty phase of a trial."

938 S.W.2d 363, 370 (Tenn. 1996) (citations omitted).

15

The final question is whether the death sentence was imposed in an arbitrary fashion or is disproportionate to the penalty imposed in similar cases. In State v. Bland, 958 S.W.2d 651 (Tenn. 1997), the supreme court outlined the process appellate courts should employ when conducting a comparative proportionality review. The review required is not a rigid, objective test. Id. at 668. Nor are the courts bound to consider only those cases in which exactly the same aggravating circumstances have been found. State v. Brimmer, 876 S.W.2d 75, 84 (Tenn. 1994). With respect to the circumstances of the offense, we consider: (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. Bland, 958 S.W.2d at 667. With respect to comparing the character of the defendants, the following factors are relevant: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); and (8) the defendant's capacity for rehabilitation. Id.

Here, the defendant randomly chose his victim, forced him to remove his pants, and stole $3.00. The defendant struck the victim with his gun and eventually shot him in the back five times. Another victim of the robbery successfully avoided serious injury. Although the defendant was accompanied by two accomplices in the robbery, the evidence at trial demonstrated that the defendant administered the blows and fired the fatal shots. Despite his assertion

16

that he was unfamiliar with the weapon he utilized in the murder, the defendant also attempted to rob and shoot Joseph William Hunter earlier that same night. Although the defendant fired at least five shots into an occupied car, Hunter survived the ordeal despite two gunshot wounds. The defendant was arrested by the police ten days later and confessed to the crimes. While the defendant expressed his remorse, he declined to accept full responsibility for his actions, claiming that he blacked out from the effects of drugs or alcohol, could not remember the events, and that police had coerced his detailed confession. The defendant also claimed at trial that he could not remember any of the events due to his intoxication. The presentence report indicates that the defendant had a prior conviction as an adult for possession of marijuana and was involved in instances of misconduct as a juvenile, including possession of a dangerous weapon, aggravated assault, and shoplifting. The black male victim, twenty-eight years old, was apparently unknown to his assailants.

While no two cases are identical, there are several other cases similar to this in which the death penalty was imposed. In State v. Burns, 979 S.W.2d 276 (Tenn. 1998), the young, black defendant was convicted of felony murder during the perpetration of robbery and sentenced to death. The youthful defendant and his accomplices approached four young black men sitting in a car, robbed them, and killed two of them. The defendant was directly responsible for one of the deaths. The lone aggravator was that the defendant created a risk of harm to two or more persons. In State v. Howell, 868 S.W.2d 238 (Tenn. 1993), the white defendant was convicted of felony murder during perpetration of robbery of a convenient store and sentenced to death. The sole valid aggravating circumstance was that the defendant had prior violent felony convictions. On the same night, he had subsequently killed another person out of state. Howell also had a prior robbery

conviction. In <u>State v. Bobo</u>, 727 S.W.2d 945 (Tenn. 1987), the black defendant and his accomplices robbed and at random killed a victim who was standing near the street. Bobo was convicted of felony murder and sentenced to death. The aggravating circumstance was that the defendant had prior violent felony convictions (while on a spree including two other robberies, one of which resulted in the death of a victim, the defendant robbed and killed a second individual for which the death penalty was imposed). The similarity of this case with the penalties imposed in <u>Burns</u>, <u>Howell</u>, and <u>Bobo</u> convinces us that the result here was neither disproportionate nor arbitrary. <u>Bland</u>, 958 S.W.2d at 968.

Accordingly, the judgment of the trial court is affirmed.

_____
Gary R. Wade, Presiding Judge

CONCUR:

_____
Thomas T. Woodall, Judge

_____
John Everett Williams, Judge